**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201
David J. Sheehan
Keith R. Murphy
Geraldine E. Ponto
Ona T. Wang

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (BRL) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | Adv. Pro. No. 10-05383 (BRL) |
| v. | |
| STANLEY SHAPIRO, individually, as general partner of S&R Investment Co., as trustee for LAD Trust, as trustee for David Shapiro 1989 Trust, as amended, and as trustee for Leslie Shapiro 1985 Trust, as amended, | |
| RENEE SHAPIRO, individually, as general partner | |



of S&R Investment Co., as trustee for LAD Trust,
as trustee for David Shapiro 1989 Trust, as
amended, and as trustee for Leslie Shapiro 1985
Trust, as amended,

S&R INVESTMENT CO.,

LAD TRUST,

DAVID SHAPIRO, individually and as trustee for
Trust f/b/o ████ ████ [W.P.S.] & ████
████ [J.G.S.],

RACHEL SHAPIRO,

DAVID SHAPIRO 1989 TRUST, as amended,

TRUST F/B/O ████ ████ [W.P.S.] &
████ ████ [J.G.S.],

LESLIE SHAPIRO CITRON,

LESLIE SHAPIRO 1985 TRUST, as amended,

TRUST F/B/O ████ ████ [A.J.C.],
████ ████ [K.F.C.], and ████ ████
[L.C.C.], as amended, and

KENNETH CITRON, individually and as trustee
for Trust f/b/o ████ ████ [A.J.C.],
████ ████ [K.F.C.], and ████ ████
[L.C.C.], as amended,

                              Defendants.

## FIRST AMENDED COMPLAINT

Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of Bernard

L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act,

15 U.S.C. sections 78aaa, *et seq*. ("SIPA"), and the substantively consolidated estate of Bernard

L. Madoff individually, by and through his undersigned counsel, for his First Amended

Complaint against Stanley Shapiro, Renee Shapiro, S&R Investment Co., LAD Trust, David

Shapiro, David Shapiro 1989 Trust, as amended ("David Shapiro Trust"), Trust f/b/o ▮▮▮▮

▮▮▮▮ [W.P.S.] & ▮▮▮▮ ▮▮▮▮ [J.G.S.] ("Trust f/b/o David Shapiro's Children"), Leslie

Shapiro Citron (*née* Leslie Shapiro), Leslie Shapiro 1985 Trust, as amended ("Leslie Shapiro

Trust"), Trust f/b/o ▮▮▮▮ ▮▮▮▮ [A.J.C.], ▮▮▮▮ ▮▮▮▮ [K.F.C.], and ▮▮▮▮

▮▮▮▮ [L.C.C.], as amended ("Trust f/b/o Leslie Shapiro Citron's Children"), and Kenneth

Citron (collectively, "Defendants") states as follows:

## INTRODUCTION

1.      This adversary proceeding arises from the massive Ponzi scheme perpetrated by

Bernard L. Madoff ("Madoff").  Over the course of the scheme, there were more than 8,000

client accounts at BLMIS.  In early December 2008, BLMIS generated client account statements

for its approximately 4,900 open client accounts.  When added together, these statements

purportedly show that clients of BLMIS had approximately $65 billion invested with BLMIS.  In

reality, BLMIS had assets on hand worth a small fraction of that amount.  On March 12, 2009,

Madoff admitted to the fraudulent scheme and pled guilty to 11 felony counts, and was sentenced

on June 29, 2009 to 150 years in prison.

2.      Defendants Stanley Shapiro, Renee Shapiro, S&R Investment Co., LAD Trust,

David Shapiro, David Shapiro Trust, Leslie Shapiro Citron, Leslie Shapiro Trust, and Kenneth

Citron ("Initial Transferee Defendants" or the "Account Holders") were beneficiaries of this

Ponzi scheme and received avoidable transfers directly from BLMIS.

3.      Since March 1981, the Account Holders, collectively, received avoidable transfers

from BLMIS in the amount of $53,778,486 from investment accounts that they held at BLMIS

(the "Accounts").  The Trustee's investigation has revealed that at least $50,398,126 of this

amount was fictitious profit from the Ponzi scheme, in that the Account Holders withdrew more

than they invested in the Accounts.  Accordingly, the Account Holders have received at least

$50,398,126 of other people's money.  Stanley and Renee Shapiro also received numerous other payments and benefits from BLMIS, including salary payments, health care benefits, and free transportation on the BLMIS jet used by Madoff and his family.

4.     Stanley and Renee Shapiro opened their first investment account with BLMIS in the mid-1960s.  Over the years Stanley Shapiro developed a close friendship with Madoff, and by 1995, he was working as a part-time "consultant" and proprietary trader at BLMIS.  Through this close friendship and his employment at BLMIS, Stanley Shapiro had special access to Madoff and his investment advisory business (the "IA Business"), and specific information relating to the Accounts.  Stanley Shapiro and the other Account Holders knew or should have known that Madoff's IA Business was predicated on fraudulent activity, that they were benefitting from fraudulent transactions in the Accounts, and that the purported activity in the Accounts was inconsistent with legitimate trading activity and credible returns.

5.     Stanley Shapiro and the other Account Holders received many warnings of fraudulent activity at BLMIS.  The rates of return supposedly achieved in many of the Accounts were so implausibly high and inconsistent with legitimate trading activity that a good faith investor would have inquired further.  In several years, the purported annual rates of return for certain of the Accounts were as high as 102%, 69%, and 63%.  Stanley and Renee Shapiro purportedly achieved a positive rate of return in their primary account with BLMIS (No. 1SH014) every year from 1999 through 2008, even though the S&P 100 Index declined during half of these years.  Stanley Shapiro and the other Account Holders also knew or should have known that they were reaping the benefits of fraudulent or irregular activity because of Stanley Shapiro's ability to "cancel" trades which purportedly had occurred already, and because

of BLMIS's implausible prescience in its short-term trading and the backdated trades and other

glaring trading irregularities in the Accounts.

6.       Defendants Stanley Shapiro, Renee Shapiro, LAD Trust, David Shapiro, David

Shapiro Trust, Rachel Shapiro, Trust f/b/o David Shapiro's Children, Leslie Shapiro Citron,

Leslie Shapiro Trust, Trust f/b/o Leslie Shapiro Citron's Children, and Kenneth Citron

(collectively, "Subsequent Transferee Defendants") received subsequent transfers of some or all

of the avoidable transfers referenced above.  To the extent the funds transferred from BLMIS

were to or for the benefit of any of the Subsequent Transferee Defendants, said Subsequent

Transferee Defendants are the initial transferees of such transfers and are included in the

definition of the Initial Transferee Defendants for purposes of the allegations herein.

7.       This adversary proceeding is brought pursuant to 15 U.S.C. sections 78fff(b),

78fff-1(a) and 78fff-2(c)(3), sections 105(a), 502(d), 510(c), 544, 548(a), 550(a) and 551 of title

11 of the United States Code, 11 U.S.C. sections 101 *et seq*. (the "Bankruptcy Code"), the New

York Fraudulent Conveyance Act (New York Debtor and Creditor Law sections 270 *et seq*.

(McKinney 2001) ("DCL")), New York Civil Practice Law and Rules ("N.Y. C.P.L.R.") sections

203(g) and 213(8) (McKinney 2001), and other applicable law, for avoidance of fraudulent

conveyances and disallowance and/or equitable subordination of claims, in connection with

certain transfers of property by BLMIS to or for the benefit of Defendants.  The Trustee seeks to

set aside such transfers and preserve and recover the property or its value for the benefit of

BLMIS's defrauded customers.

## JURISDICTION AND VENUE

8.       This is an adversary proceeding commenced before the same Court before which

the main underlying SIPA proceeding, No. 08-01789 (BRL) (the "SIPA Proceeding"), is

pending.  The SIPA Proceeding was originally brought in the United States District Court for the

Southern District of New York as *Securities and Exchange Commission v. Bernard L. Madoff*

*Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding"), and has

been referred to this Court.  This Court has jurisdiction over this adversary proceeding under 28

U.S.C. § 1334(b) and 15 U.S.C. §§ 78eee(b)(2)(A) and (b)(4).

9.     This is a core proceeding pursuant to 28 U.S.C. section 157(b)(2)(A), (B), (H),

and (O).

10.     Venue in this district is proper under 28 U.S.C. section 1409.

## THE DEFENDANTS

11.     Defendants Stanley Shapiro and Renee Shapiro maintain their principal residence in

New York, New York (the "Shapiro Home Address").  Stanley Shapiro was associated with

Madoff on a business level, social level, or both for more than forty years.

12.     Defendant S&R Investment Co. is a partnership formed under the laws of the state

of New York.  Its principal place of business is located at the Shapiro Home Address.  Stanley

and Renee Shapiro are the general partners of S&R Investment Co.  Stanley Shapiro managed all

of the business and other affairs of S&R Investment Co.

13.     Defendants David Shapiro and Rachel Shapiro maintain their primary residence in

New York, New York.  David Shapiro is the son of Stanley and Renee Shapiro.

14.     Defendants Kenneth Citron and Leslie Shapiro Citron maintain their primary

residence in New York, New York.  Leslie Shapiro Citron is the daughter of Stanley and Renee

Shapiro.

15.     Upon information and belief, Defendant LAD Trust is a trust established by Stanley

and Renee Shapiro for the benefit of their children.  Stanley Shapiro and Renee Shapiro served

as trustees of said trust.

16.   Defendant David Shapiro Trust and Leslie Shapiro Trust were formed and thereafter amended by Stanley and Renee Shapiro for the benefit of David Shapiro and Leslie Shapiro.  Stanley Shapiro and Renee Shapiro served as trustees of said trusts.

17.   Defendant Trust f/b/o David Shapiro's Children is a trust established in September 2007 for the benefit of David and Rachel Shapiro's two children, J.G.S. and W.P.S.  David Shapiro is a trustee of said trust.

18.   Defendant Trust f/b/o Leslie Shapiro Citron's Children is a trust established in September 2007 for the benefit of the three children of Kenneth Citron and Leslie Shapiro Citron, A.J.C., K.F.C., and L.C.C.  Kenneth Citron is a trustee of said trust.

## BACKGROUND, THE TRUSTEE, AND STANDING

19.   On December 11, 2008 (the "Filing Date"),[1] Madoff was arrested by federal agents for violation of the criminal securities laws, including, *inter alia*, securities fraud, investment adviser fraud, and mail and wire fraud.  Contemporaneously, the Securities and Exchange Commission ("SEC") filed a complaint in the District Court which commenced the District Court Proceeding against Madoff and BLMIS.  The District Court Proceeding remains pending in the District Court.  The SEC complaint alleged that Madoff and BLMIS engaged in fraud through the investment advisor activities of BLMIS.

20.   On December 12, 2008, The Honorable Louis L. Stanton of the District Court entered an order appointing Lee S. Richards, Esq. as receiver for the assets of BLMIS.

21.   On December 15, 2008, pursuant to 15 U.S.C. section 78eee(a)(4)(A), the SEC consented to a combination of its own action with an application of the Securities Investor

---

[1] Section 78*lll*(7)(B) of Title 15 states that the filing date is "the date on which an application for a protective decree is filed under section 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such

Protection Corporation ("SIPC").  Thereafter, pursuant to 15 U.S.C. section 78eee(a)(4)(B),

SIPC filed an application in the District Court alleging, *inter alia*, that BLMIS was not able to

meet its obligations to securities customers as they came due and, accordingly, its customers

needed the protections afforded by SIPA.

      22.    Also on December 15, 2008, Judge Stanton granted the SIPC application and

entered an order pursuant to SIPA (the "Protective Decree") which, in pertinent part:

          a.    appointed the Trustee for the liquidation of the business of BLMIS pursuant

to 15 U.S.C. section 78eee(b)(3);

          b.    appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to

15 U.S.C. section 78eee(b)(3);

          c.    removed the case to this Bankruptcy Court pursuant to 15 U.S.C.

section 78eee(b)(4); and

          d.    released Lee S. Richards as receiver for BLMIS by this Protective Decree.

      23.    By orders dated December 23, 2008 and February 4, 2009, respectively, the

Bankruptcy Court approved the Trustee's bond and found that the Trustee was a disinterested

person.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of

BLMIS.

      24.    At a Plea Hearing on March 12, 2009, in the case captioned *United States v.*

*Madoff*, Case No. 09-CR-213(DC), Madoff pled guilty to an eleven-count criminal information

filed against him by the United States Attorneys' Office for the Southern District of New York.

At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment

advisory side of [BLMIS]."  *See* Plea Allocation of Bernard L. Madoff at 23, *United States v.*

---

proceeding was commenced."  Thus, even though the application for a protective decree was filed on December 15,
2008, the Filing Date in this action is December 11, 2008.

*Madoff,* No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50) ("Madoff Plea

Allocution"). Additionally, Madoff asserted "[a]s I engaged in my fraud, I knew what I was

doing [was] wrong, indeed criminal." *Id.*

25.     On August 11, 2009, a former BLMIS employee, Frank DiPascali, pled guilty to

participating and conspiring to perpetuate the Ponzi scheme. At a Plea Hearing on August 11,

2009, in the case entitled *United States v. DiPascali,* Case No. 09-CR-764 (RJS), DiPascali pled

guilty to a ten-count criminal information. Among other things, DiPascali admitted that the

Ponzi scheme had begun at BLMIS as early as the 1980s. *See* Plea Allocution of Frank

DiPascali at 46, *United States v. DiPascali,* No. 09-CR-764 (RJS) (S.D.N.Y. August 11, 2009)

(Docket No. 11).

26.     As the Trustee appointed under SIPA, the Trustee has the job of recovering and

paying out customer property to BLMIS's customers, assessing claims, and liquidating any other

assets of the firm for the benefit of the estate and its creditors. The Trustee is in the process of

marshalling BLMIS's assets, and the liquidation of BLMIS's assets is well underway. However,

such assets will not be sufficient to reimburse the customers of BLMIS for the billions of dollars

that they invested with BLMIS over the years. Consequently, the Trustee must use his authority

under SIPA and the Bankruptcy Code to pursue recovery from customers who received

preferences, payouts of fictitious profits and/or other avoidable transfers to the detriment of other

defrauded customers whose money was consumed by the Ponzi scheme. Absent this or other

recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A)

through (D) of 15 U.S.C. section 78fff-2(c)(1).

27.     Under 15 U.S.C. section 78fff-1(a), the Trustee has the general powers of a

bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by

SIPA.  Under 15 U.S.C. section 78fff(b), "chapters 1, 3, 5 and subchapters I and II of chapter 7

of [the Bankruptcy Code]" are applicable here, "[t]o the extent consistent with [SIPA]."

28.     Pursuant to 15 U.S.C. sections 78fff(b) and 78*lll*(7)(B), the Filing Date is deemed to

be the date of the filing of the petition within the meaning of section 548 of the Bankruptcy Code

and the date of the commencement of the case within the meaning of section 544 of the

Bankruptcy Code.

29.     The Trustee has standing to bring these claims pursuant to 15 U.S.C. section 78fff-1

and the Bankruptcy Code, including sections 323(b) and 704(a)(1), because, among other

reasons:

     a.     Defendants received "customer property" as defined in 15 U.S.C.

section 78*lll*(4);

     b.     BLMIS incurred losses as a result of the claims set forth herein;

     c.     BLMIS's customers were injured as a result of the conduct detailed

herein;

     d.     SIPC cannot by statute advance funds to the Trustee to fully reimburse all

customers for all of their losses;

     e.     the Trustee will not be able to fully satisfy all claims;

     f.     the Trustee, as bailee of customer property, can sue on behalf of customer

bailors;

     g.     the Trustee is the assignee of claims paid, and to be paid, to customers of

BLMIS who have filed claims in the liquidation proceeding (such claim-filing customers,

collectively, "Claimants").  As of the date hereof, the Trustee has received multiple express and

unconditional assignments of the applicable Claimants' causes of action, which actions could

have been asserted against Defendants. As assignee, the Trustee stands in the shoes of persons

who have suffered injury in fact and a distinct and palpable loss for which the Trustee is entitled

to reimbursement in the form of monetary damages. The Trustee brings this action on behalf of,

among others, those defrauded customers of BLMIS who invested more money in BLMIS than

they withdrew;

        h.    SIPC is the subrogee of claims paid, and to be paid, to customers of BLMIS

who have filed claims in the liquidation proceeding. SIPC has expressly conferred upon the

Trustee enforcement of its rights of subrogation with respect to payments it has made and is

making to customers of BLMIS from SIPC funds; and

        i.    the Trustee has the power and authority to recover transfers under sections

544, 547, 548, 550(a), and 551 of the Bankruptcy Code and 15 U.S.C. section 78fff-2(c)(3).

## THE FRAUDULENT PONZI SCHEME

    30.    Founded in 1959, BLMIS began operations as a sole proprietorship of Madoff and

later, effective January 2001, formed a New York limited liability company wholly owned by

Madoff. Since in or about 1987, BLMIS operated from its principal place of business at 885

Third Avenue, New York, New York. Madoff, as founder, chairman, and chief executive

officer, ran BLMIS together with several family members and a number of additional employees.

BLMIS was registered with the SEC as a securities broker-dealer under Section 15(b) of the

Securities Exchange Act of 1934, 15 U.S.C. section 78*o*(b). By that registration, BLMIS is a

member of SIPC. BLMIS had three business units: investment advisory (again, the "IA

Business"), market making, and proprietary trading.

    31.    For certain accounts in the IA Business, which included some of the Accounts held

and/or managed by Stanley Shapiro and the other Defendants, BLMIS purported to participate in

a capital appreciation/depreciation strategy, depending on whether the customer sought to

generate gains or losses.  For example, the strategy was executed by either purporting to purchase small groups of securities transactions near lows and then purporting to sell those same securities at highs, or by purporting to short-sell securities near highs and then purporting to repurchase those securities near lows.

32.    For other accounts, which included some of the Accounts held and/or managed by Stanley Shapiro and other Defendants, Madoff described the IA Business' investment strategy as a "split-strike conversion" strategy.  Madoff promised these clients that their funds would be invested in a basket of common stocks within the S&P 100 Index, which is a collection of the 100 largest U.S. publicly traded companies.  The basket of stocks was intended to mimic the movement of the S&P 100 Index.  Madoff asserted that he would time purchases and sales carefully to maximize value, but this meant that the clients' funds would be intermittently out of the market, at which times they would be purportedly invested in U.S. issued securities and money market funds.  The second part of the split-strike conversion strategy was the hedge of such purchases with option contracts.  Madoff purported to purchase and sell S&P 100 Index option contracts that closely corresponded with the stocks in the basket, thereby controlling the downside risk of price changes in the basket of stocks.

33.    Although clients of the IA Business received monthly or quarterly statements purportedly showing the securities that were held in, or had been traded through, their accounts, as well as the growth of and profit from those accounts over time, the trades reported on these statements were a complete fabrication.  The security purchases and sales depicted in the account statements virtually never occurred and the profits reported were entirely fictitious.  At his Plea Hearing, Madoff admitted that he never in fact purchased any of the securities he claimed to have purchased for customer accounts.  *See* Madoff Plea Allocution, at 25.  Indeed, based on the

Trustee's investigation to date and with the exception of isolated individual trades for certain clients, there is no record of BLMIS having cleared any purchase or sale of securities on behalf of the IA Business at the Depository Trust & Clearing Corporation, the clearing house for such transactions, or any other trading platform on which BLMIS reasonably could have traded securities.

34.   Prior to his arrest, Madoff assured clients and regulators that he conducted all trades on the over-the-counter market after hours.  To bolster that lie, Madoff wired hundreds of millions of dollars over the years to BLMIS's affiliate, Madoff Securities International Ltd. ("MSIL"), a London based entity substantially owned by Madoff and his family.  There are no records that MSIL ever used the wired funds to purchase securities for the accounts of the IA Business customers.  Rather, MSIL simply wired hundreds of millions of dollars back into the bank accounts maintained by BLMIS.  Additionally, based on the Trustee's investigation to date, there is no evidence that BLMIS ever purchased or sold any of the options that Madoff claimed on customer statements that BLMIS had purchased or sold.

35.   For all periods relevant hereto, the IA Business was operated as a Ponzi scheme and Madoff and his co-conspirators concealed the ongoing fraud in an effort to hinder and delay other current and prospective customers of BLMIS from discovering the fraud.  The money received from investors was not set aside to buy securities as purported, but instead was primarily used to make the distributions to, or payments on behalf of, other investors.  The money sent to BLMIS for investment, in short, was simply used to keep the operation going and to enrich Madoff, his associates and others, including Defendants, until such time as the requests for redemptions overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme in December 2008.

36.     The payments to investors constituted an intentional misrepresentation of fact regarding the underlying accounts and were an integral and essential part of the fraud.  The payments were necessary to validate the false account statements, and were made to avoid detection of the fraud, to retain existing investors, and to lure other investors into the Ponzi scheme.

37.     During the scheme, certain investors requested and received distributions of the "profits" listed for their accounts which were nothing more than fictitious profits.  Other investors, from time to time, redeemed or closed their accounts, or removed portions of the purportedly available funds, and were paid consistently with the statements they had been receiving.  Some of those investors later re-invested with BLMIS part or all of those withdrawn payments.

38.     When payments were made to or on behalf of these investors, including the Account Holders, the falsified monthly statements of accounts reported that the accounts of such investors included substantial gains.  In reality, BLMIS had not invested the investors' principal as reflected in customer statements.  To conceal the ongoing fraud and thereby hinder, delay, and defraud other current and prospective investors, BLMIS paid to or on behalf of certain investors, such as Defendants, the inflated amounts reflected in the falsified financial statements, including principal, fictitious profits, or both.

39.     BLMIS used the funds deposited from new investments to continue operations and pay redemption proceeds to or on behalf of other investors and to make other transfers.  Due to the siphoning and diversion of new investments to fund redemptions requested by other investors, BLMIS did not have the funds to pay investors on account of their new investments.

BLMIS was able to stay afloat only by using the principal invested by some clients to pay other investors or their designees.

40.    In an effort to hinder, delay or defraud authorities from detecting the fraud, BLMIS did not register as an Investment Advisor until August 2006.  In or about January 2008, BLMIS filed with the SEC an amended Uniform Application for Investment Adviser Registration.  The application represented, *inter alia*, that BLMIS had 23 customer accounts and assets under management of approximately $17.1 billion.  In fact, in January 2008, BLMIS had approximately 4,900 active client accounts with a purported value of approximately $65 billion under management.

41.    Not only did Madoff seek to evade regulators, Madoff also had false audit reports "prepared" by Friehling & Horowitz, a three-person accounting firm in Rockland County, New York.  Of the two accountants at the firm, one was retired and living in Florida for many years prior to the Filing Date.

42.    At all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than the assets of BLMIS.  At all relevant times, BLMIS was insolvent in that:  (i) its assets were worth less than the liabilities that it owed; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

## THE DEFENDANTS' BLMIS ACCOUNTS

43.    Over the years, Stanley and Renee Shapiro held a number of investment accounts at BLMIS.  They opened the first of their accounts (No. 10303915)[2] jointly in their own names.  This account was later renumbered (becoming 1SH014) and changed into the name of "S&R Investment Co."  The address on the account was reported as the Shapiro Home Address.

---

[2] A list of all Accounts is set forth in Exhibit A.

44.     S&R Investment Co. held three BLMIS accounts (Nos. 10303915 (again, which became 1SH014), 1SH079, and 1SH172), with the address for each account reported as the Shapiro Home Address.  Account 1SH079 was opened in the name of S&R Investment Co. in September 1995 without a deposit or initial transfer into the account.  Account 1SH172 was opened in the name of S&R Investment Co. in April 2003, with a transfer of fictitious profits from Account 1SH014.  Stanley Shapiro managed all of the BLMIS accounts held in the name of S&R Investment Co.

45.     Stanley and Renee Shapiro also held BLMIS accounts as trustees of trusts established for the benefit of their children, including LAD Trust (No. 103012), David Shapiro Trust (No. 1SH028), and Leslie Shapiro Trust (No. 1SH030), with the address for each account reported as the Shapiro Home Address.  Renee Shapiro also held a custodial BLMIS account for her children (No. 103029).  Upon information and belief, Stanley Shapiro authorized, directed, and managed the custodial account and the accounts held in the names of LAD Trust, David Shapiro Trust, and Leslie Shapiro Trust.

46.     David Shapiro held three BLMIS accounts (Nos. 1S0306, 1SH027, and 1SH028), with the address of the accounts reported as the Shapiro Home Address.  Account 1SH027 was opened in June 1985 with a transfer of fictitious profits from Account 103029.  Account 1SH028 was opened in February 1990 with a transfer of fictitious profits from Account 103012, and was originally held in the name of the David Shapiro Trust before it was changed into the name of "David Shapiro."  Account 1S0306 was opened in May 1997 with a transfer of fictitious profits from Account 1SH027.  Upon information and belief, Stanley Shapiro authorized, directed, and managed all of the BLMIS accounts held in the name of David Shapiro or for his benefit.

47.    The Trust f/b/o David Shapiro's Children held one BLMIS account (No. 1S0540),
with the account address reported as David and Rachel Shapiro's home address in New York,
New York.  The trust account was opened with a transfer of fictitious profits from S&R
Investment Co. Account 1SH172.  Upon information and belief, Stanley and Renee Shapiro,
largely if not completely, funded Account 1S0540 with subsequent transfers of fictitious profits
they received in connection with one or more of their BLMIS accounts.

48.    Leslie Shapiro Citron held two BLMIS accounts in the name "Leslie Shapiro"
(Nos. 1SH029 and 1SH171), with the address of the accounts reported as Kenneth and Leslie
Shapiro Citron's home address in New York, New York.  Account 1SH029 was opened in June
1985 with a transfer of fictitious profits from Account 103029.  Leslie Shapiro Citron held an
additional BLMIS account in the name of "Leslie Shapiro Citron" (No. 1SH030), with the
account address reported as the Shapiro Home Address.  This account was opened in February
1990 with a transfer of fictitious profits from Account 103012, and originally was held through
the Leslie Shapiro Trust.

49.    Kenneth Citron and Leslie Shapiro Citron held a BLMIS account in the name of
"Kenneth & Leslie Shapiro Citron" (No. 1C1251), with the address of the account reported as
Kenneth and Leslie Shapiro Citron's home address in New York, New York.  Account 1C1251
was opened in May 1997 with a transfer of principal and fictitious profits from Leslie Shapiro
Citron's Account 1SH029.  Kenneth Citron also held a BLMIS account in the name of "Kenneth
Citron" (No. 1C1214), with the account address reported as Kenneth Citron's former home
address in Boston, Massachusetts.  Account 1C1214 was opened in June 1994.  Upon
information and belief, Stanley Shapiro authorized, directed, and managed all of the BLMIS
accounts held in the name of Leslie Shapiro Citron or for her benefit.

50.     The Trust f/b/o Leslie Shapiro Citron's Children held one BLMIS account

(No. 1C1345), with the account address reported as Kenneth and Leslie Shapiro Citron's home

address in New York, New York.  The account was opened in September 2007 with a transfer of

principal and fictitious profits from Kenneth Citron's Account 1C1327.  Upon information and

belief, Stanley and Renee Shapiro largely funded Account 1C1345 with subsequent transfers of

fictitious profits they received in connection with one or more of their BLMIS accounts.

### STANLEY SHAPIRO AND THE OTHER ACCOUNT HOLDERS WERE ON NOTICE OF FRAUDULENT ACTIVITY AT BLMIS

51.     Stanley Shapiro and the other Account Holders knew or should have known that

Madoff's IA Business was predicated on fraud, that they and the other Defendants were

benefitting from fraudulent or, at a minimum, highly irregular transactions in the Accounts, and

that the purported activity in the Accounts was inconsistent with legitimate trading activity and

credible returns.

A.      STANLEY SHAPIRO CLOSELY MONITORED THE ACCOUNTS AT BLMIS AND ENJOYED UNUSUAL ACCESS TO MADOFF AND THE IA BUSINESS.

52.     Stanley Shapiro enjoyed a long career in the garment industry.  For years, he

worked for Kay Windsor, Inc., a once nationally recognized dress manufacturer, which was

owned and operated by another large investor at BLMIS, Carl Shapiro.  Stanley Shapiro went on

to serve as the president of Kay Windsor for about twenty years.  As president he helped take the

company public in 1960, and thereafter received shares in the company as well as stock options.

Later as president, he played a significant role when Kay Windsor was acquired by V.F. Corp.

("Vanity Fair").  After the acquisition, he remained with the company and continued to oversee

the manufacture and marketing of dresses and other clothing lines for Vanity Fair.  Through his

decades as a senior officer at Kay Winsor and then Vanity Fair, Stanley Shapiro developed an acute business sense and insight into the investment world.

53.    Over the years, Stanley Shapiro sought tax and investment advice from others.  In the mid-1960s, he began conferring with Ed Kostin of Coopers & Lybrand regarding tax issues relating to his and his family's investments at BLMIS.  In the early 1970s, at Carl Shapiro's recommendation, Stanley Shapiro hired a bookkeeper to assist him in regularly monitoring the Accounts that he and his family held at BLMIS at that time.  In 1996, he stopped using the bookkeeper, and hired an accounting firm to provide tax and other advice relating to his and his family's Accounts.  First the bookkeeper and then the accounting firm regularly provided Stanley Shapiro with detailed schedules of the unrealized and realized gains and losses relating to the BLMIS Accounts.

54.    Stanley Shapiro closely monitored the purported investments in the Accounts.  He regularly reviewed monthly account statements and portfolio management reports provided by BLMIS as well as the schedules of realized and unrealized gains and losses prepared first by his bookkeeper and then the accounting firm.  Using these statements, reports, and schedules, he monitored the Accounts and examined whether they were attaining their expected level or levels of return based on purported net working capital and benchmark rates of return.  Stanley Shapiro also directed, often for tax purposes, that specified gains or losses purportedly be achieved in certain of the Accounts.  He also directed that funds be transferred among the Accounts, and requested and received distributions from the Accounts.

55.    In or about 1995, Stanley Shapiro began working as a "consultant" and a proprietary trader for BLMIS.  Through a legitimate proprietary account, BLMIS provided him with capital with which to trade in shares of public companies involved in the clothing and

fashion industry. Over the years, he was often successful in his proprietary trading for BLMIS. For example, he generated profits of approximately $245,000 in 1999, $385,000 in 2000, and $360,000 in 2001.

56.     As a longtime friend of Madoff and BLMIS employee, Stanley Shapiro enjoyed unusual access to Madoff and the IA Business. Unlike other BLMIS investors, Stanley Shapiro often contacted Madoff or others at BLMIS directly to request specific gains and losses in certain of the Accounts. Telephone records show that he spoke with Madoff dozens of times from his homes in Manhattan and Bridgehampton, Long Island. BLM Air Charter LLC records reveal that he travelled with Madoff or other Madoff family members on BLMIS's private plane on at least 27 occasions between October 2002 and December 2008. And, BLMIS key card records show that Stanley Shapiro visited the 17th floor, the floor of BLMIS where the IA Business was located, on more than 150 occasions from 2005 through 2008.

57.     As a reasonably sophisticated investor who closely monitored his investments with BLMIS and who enjoyed unusual access to Madoff and the IA Business, Stanley Shapiro knew or should have known that Defendants were benefitting from the fraudulent activity at BLMIS. Among other things, Stanley Shapiro was on notice of the indicia of irregularity and fraud in the Accounts, but he failed to make sufficient inquiry regarding: (i) the extraordinary and implausible rates of return achieved in many of the Accounts; (ii) his ability to "cancel" trades that purportedly had already occurred in certain of the Accounts; (iii) the implausible prescience demonstrated by BLMIS in its short-term trading in certain of the Accounts; and (iv) the backdating of trades reported in certain of the Accounts.

B.    THE ACCOUNTS EARNED EXTRAORDINARY AND
IMPLAUSIBLY HIGH RATES OF RETURN EVEN THOUGH THE
ACCOUNT HOLDERS MADE NO ADDITIONAL INVESTMENTS
FOR NEARLY THREE DECADES.

58.    Stanley Shapiro and the other Account Holders knew or should have known that the

extraordinary and implausibly high rates of return in their Accounts were not possible through

legitimate securities trading.  Although Stanley Shapiro apparently deposited cash and securities

with BLMIS during the early years of his investing with BLMIS, he and the other Account

Holders made virtually no cash or other deposits into the Accounts after the 1970s.  For example,

S&R Investment Co. never made a deposit into any of its several BLMIS accounts

(Nos. 10303915, 1SH014, 1SH079, and 1SH172) after March 1982.  Nevertheless, over this

same period, Stanley and Renee Shapiro withdrew $37 million in cash from S&R Investment

Co.'s accounts at BLMIS.  Nearly all of what they withdrew were fictitious profits from the

Ponzi scheme.

59.    The BLMIS accounts established by Stanley and Renee Shapiro for the benefit of

their children exhibited a similar pattern.  While only limited deposits were made into BLMIS

accounts Nos. 103012, 103029, 1SH027, 1SH028, 1SH029, 1SH030, 1SH171, and 1S0306,

respectively, after 1982, more than $15 million was withdrawn from these accounts over that

same time period.  The vast majority of these withdrawals were fictitious profits.

60.    The rates of return purportedly achieved in the Accounts were implausibly high.

For example, S&R Investment Co. Account 1SH014 achieved a positive rate of return every year

from 1999 through 2008.  In 1999, the account enjoyed an extraordinary 69.4% rate of return.  In

2002, its rate of return was 45.7%, despite the fact that the S&P 100 Index declined by nearly

24% for that year.  And in 2003, S&R Investment Co. Account 1SH014 enjoyed a 41.6% rate of

return, which was nearly twice the return of the S&P 100.  Purported equity in the account, net of

capital withdrawals, increased by $11.4 million in 2003.  Given the extraordinary and

implausibly high rates of return over the years, Stanley Shapiro and the other Account Holders

knew or should have known that the purported activity in the Accounts was inconsistent with

legitimate trading activity and credible returns.

       C.     <u>BLMIS ALLOWED STANLEY SHAPIRO TO "CANCEL" TRADES
WHICH REPORTEDLY ALREADY HAD BEEN MADE.</u>

       61.    Stanley Shapiro and the other Account Holders also knew or should have known

that they were benefitting from fraudulent activity in the Accounts because Madoff and others at

BLMIS allowed Stanley Shapiro to "cancel" trades which purportedly already had occurred in

certain of the Accounts.  For example, in February 2000, Stanley Shapiro spoke to BLMIS's

Annette Bongiorno about his desire to "cancel" a number of trades that BLMIS purportedly had

made approximately six weeks earlier in certain of the Accounts.  According to a

contemporaneous note written by Stanley Shapiro, Bongiorno gave him a firm "deadline" to

decide whether to cancel one or more of the trades.  And BLMIS allowed him to do so, thereby

permitting him to eliminate certain capital losses.  No investor, especially a reasonably

sophisticated investor like Stanley Shapiro, should have believed it was possible to "cancel" a

stock transaction that purportedly had occurred approximately six weeks earlier, absent irregular

or fraudulent practices.

       D.     <u>BLMIS DEMONSTRATED IMPLAUSIBLE PRESCIENCE IN ITS
SHORT TERM TRADING IN CERTAIN OF THE ACCOUNTS,
OFTEN GENERATING SPECIFIC GAINS AND LOSSES
REQUESTED BY STANLEY SHAPIRO.</u>

       62.    Stanley Shapiro and the other Account Holders knew or should have known that the

Account Holders were benefitting from fraudulent transactions in their Accounts because of

BLMIS's incredible ability to achieve short-term gains or losses in certain Accounts.  The

investment strategy in the majority of the Accounts was long-term growth through a "buy and

hold" strategy.  Contrary to this strategy, monthly statements for many of these Accounts often showed short-term trading engineered solely to achieve significant short-term gains or losses sought by Stanley Shapiro.  These monthly statements reflected a consistent and remarkable ability of BLMIS to buy stocks near their monthly lows and sell stocks near their monthly highs, or conversely to sell stocks short near their monthly highs and repurchase stocks near their monthly lows.

63.     Stanley Shapiro either knew or should have known of BLMIS's implausible prescience in its short-term trading in certain Accounts.  In or around October or November of each calendar year, Stanley Shapiro reviewed his and his family's realized and unrealized gains and losses in their BLMIS Accounts to gauge their projected tax liability.  Stanley Shapiro often would request Madoff or others at BLMIS generate specific gains or losses in certain Accounts. Rather than sell securities that were reportedly held in the Accounts to achieve the desired gain or loss, BLMIS purported to buy and then quickly sell large blocks of shares that produced the very gain or loss sought by Stanley Shapiro.  Typically, the BLMIS customer statements reported that the sales took place before the gain or loss had been requested by Stanley Shapiro.  These unbelievable trades occurred over many years in many of the Accounts.

64.     For example, on November 10, 2000, Stanley Shapiro requested that BLMIS achieve a $50,000 loss in S&R Investment Co.'s Account 1SH014, a $110,000 loss in Leslie Shapiro Citron's Account 1SH030, and a $60,000 loss in David Shapiro's Account 1SH028. BLMIS engineered the requested losses in each account by backdating purchases prior to Stanley Shapiro's November 10, 2001 request.  For S&R Investment Co. Account 1SH014, BLMIS purportedly purchased 5,000 shares of Oracle at $34.50 per share on October 27, 2000 (which

settled November 1), and just two weeks later, purportedly sold the same 5,000 shares of Oracle at $25.00 per share to generate a loss of $47,500.

65.    The purchase and sale of shares in Oracle is incredible for several reasons, any one of which should have put Stanley Shapiro on notice of fraudulent activity at BLMIS.  First, the purchase was backdated two weeks before he even requested the $50,000 loss in Account 1SH014.  Second, the value of Oracle declined enough for him to achieve just about the requested loss.   Third, even though the Oracle shares were purportedly purchased weeks apart, the purchase and sale were recorded on S&R Investment Co.'s account statement with consecutive transaction numbers, indicating that they were executed consecutively.  Fourth, Account 1SH014 employed a long-term "buy and hold" investment strategy and typically held securities for years, not weeks.  And fifth, BLMIS duplicated the backdated transaction in accounts for Leslie Shapiro Citron and David Shapiro to engineer losses sought by Stanley Shapiro in these accounts.

66.    On November 1, 2001, Stanley Shapiro requested that Bongiorno generate a $360,000 gain in S&R Investment Co. Account 1SH014.  Based on a schedule of unrealized gains and losses, Stanley Shapiro knew that S&R Investment Co. purportedly owned many securities with unrealized gains that BLMIS purportedly could have sold to generate the requested $360,000 gain.  The November 2001 statement for Account 1SH014, however, reflects a purchase of a block of Sabre Holdings shares on October 31, 2001 (which settled November 2), and a sale of the same block of shares less than three weeks later on November 19, 2001 (which settled November 23).  Incredibly, the purported short-term investment in Sabre Holdings generated a short-term capital gain of $360,770, almost exactly what Stanley Shapiro had requested.

67.     About a month later on December 12, 2001, Stanley Shapiro requested that

Bongiorno generate a $125,000 *loss* in S&R Investment Co. Account 1SH014.  The December

2001 statement for Account 1SH014 shows a purported purchase of Too Inc. shares on

November 30, 2001 (which settled December 5), and a sale of the same shares less than two

weeks later on December 12, 2001 (which settled December 17).  The purported investment

generated a loss of $124,380.  This is incredible considering that BLMIS supposedly purchased

the shares of Too Inc. nearly two weeks before Stanley Shapiro requested the $125,000 loss.  No

reasonable investor, much less a reasonably sophisticated investor like Stanley Shapiro, should

have believed this trade, and the other trades described above, to be legitimately possible.

E.     <u>BLMIS BACKDATED TRADES IN SEVERAL OF THE ACCOUNTS,
       WHICH PLACED STANLEY SHAPIRO AND THE OTHER
       ACCOUNT HOLDERS ON NOTICE OF FRAUDULENT ACTIVITY
       AT BLMIS</u>.

68.     Stanley Shapiro and the other Account Holders also knew or should have known

they were benefitting from fraudulent transactions because of backdated trading activity in many

of the Accounts.  Stanley Shapiro was placed on notice as early as 1992 that BLMIS was

backdating trades in certain Accounts.  The April 1992 statement for S&R Investment Co.

Account 1SH014 reflects that BLMIS purchased 5,000 shares of Halliburton at $21.88 per share

on April 10, 1992 (which settled April 20).  The share price of $21.88 fell outside the range of

prices at which Halliburton shares traded that particular day, so BLMIS effectively cancelled the

purported trade by subsequently backdating on the face of the May 1992 account statement for

Account 1SH014 a sale of 5,000 shares of Halliburton on April 10, 1992 (which settled April 20)

for the same price of $21.88 per share.  Halliburton was not the only backdated transaction

appearing on the May 1992 statement for Account 1SH014.  The statement also reports a

purchase of Fluor shares on April 2, 1992 (which settled April 9).  A good faith investor, whether

sophisticated or not, would or should have inquired why the backdated Halliburton and Fluor

transactions did not appear on the April statement for Account 1SH014.

69.     In late 2002 or early 2003, Stanley Shapiro and other Account Holders became

aware that BLMIS backdated a large number of purported "short-against-the-box" sales, which

resulted in an apparent massive tax liability for Stanley Shapiro and other Account Holders.  As

described above at Paragraph 54, Stanley Shapiro estimated in or about October or November of

each year the expected tax liability that he and his family would have for the year in connection

with the Accounts by reviewing detailed schedules of realized and unrealized gains and losses in

the Accounts.  During 2002, the S&P 100 Index declined by approximately 23%, and the value

of many of the securities purportedly held by S&R Investment Co. also declined significantly in

value.  As of September 2002, the reported value of securities held in Account 1SH014 had

declined by approximately 43% for the year.  On information and belief, Stanley Shapiro

anticipated, in or about September 2002, that he and his family would have minimal, if any, tax

liability for 2002 relating to the Accounts.

70.     By late 2002, the unrealized losses reported in the accounts held by S&R

Investment Co. and other accounts held by Stanley Shapiro's family had reduced their purported

net equity to below zero.  Rather than allow their reported portfolios to be "wiped out" by these

losses, BLMIS generated massive gains by backdating a number of short sales to early 2002, i.e.,

prior to the stock market's decline.  To accomplish this, BLMIS needed Stanley Shapiro's

assistance so as to not leave behind concrete evidence, in the form of a paper trail, of the fraud.

In or about January 2003, BLMIS requested that Stanley Shapiro return the statements for

Account 1SH014 for the months of January through November 2002, as well certain statements

from 2002 relating to the largest accounts held by or for the benefit of certain of Stanley

Shapiro's children (Nos. 1SH028 and 1SH030).  By early March 2003, Stanley Shapiro had

returned the statements, and BLMIS provided him with revised statements relating to these

accounts.  These revised statements reported new, backdated short sales in accounts held by S&R

Investment Co. (No. 1SH014), David Shapiro (No. 1SH028), and Leslie Shapiro Citron

(No. 1SH030).

71.    In the revised statements relating to Account 1SH014, BLMIS reported that it had

executed a number of "short against the box" sales from January through September of 2002,

before the actual values of the securities declined dramatically by the year's end.  None of these

positions are reflected in the September 2002 schedule of unrealized gains and losses for

Account 1SH014, which Stanley Shapiro's accountant had provided to him.  For example, this

schedule showed only two open short positions from short sales of Time Warner Telecom stock

purportedly made in January of 2002.  The BLMIS statements for Account 1SH014 originally

provided to Stanley Shapiro for the months of January 2002 through September 2002 also

reported only these two short sales.  This is because BLMIS did not create these fictitious "short

against the box" positions until after September 2002.  In fact, the backdated short sales were not

manufactured or reflected in BLMIS's records until, at the earliest, late 2002.

72.    In the revised December 2002 statement for Account 1SH014, BLMIS reported that

it had delivered a number of securities that it was holding long in 1SH014 to cover the account's

backdated short positions.  The delivery of these purported securities generated approximately

$24 million in fictitious long-term gains for S&R Investment Co.  As a result, rather than having

no or a modest tax liability for the year, Stanley and Renee Shapiro had a liability in excess of $7

million.  Faced with such a massive liability, Stanley Shapiro undoubtedly either inquired or

should have inquired into how he and his wife came to have such a massive tax liability, and

upon inquiry, he either realized or should have realized, the backdated, false trades that BLMIS reportedly made in the S&R Investment Co. account.

73.     The backdated trades in the S&R Investment Co. accounts generated significant tax liabilities for Stanley and Renee Shapiro in 2003.  According to a February 2003 schedule of realized gains and losses provided to Stanley Shapiro by his accountant for Account 1SH014, S&R Investment Co. realized short-term capital gains of more than $27 million in January of 2003 as a result of covering short positions generated from the backdated trades reported in the revised 2002 statements for Account 1SH014.  Based on a contemporaneous note, Stanley Shapiro advised both Madoff and Bongiorno after receiving the schedule about the "problems" relating to his and his family's accounts, and established that June would be the "target for action."  Shortly thereafter, BLMIS began engineering significant short-term fictitious losses in the S&R Investment Co. accounts at BLMIS to eliminate the tax liability faced by Stanley and Renee Shapiro as a result of the fictitious gains in January 2003.

74.     For example, in an April 2003 statement for S&R Investment Co. Account 1SH014, BLMIS reported to Stanley Shapiro that in April 2003, it had purportedly purchased and then sold a few weeks later 125,000 shares of HCA Inc. for a loss of more than $1.5 million.  In subsequent statements for Account 1SH014, BLMIS reported that in May it sold short 135,000 shares of KB Home and then covered the short position in June for a loss of more than $3.1 million.  Also in June, BLMIS reported that it purchased 280,000 shares of National Semiconductor Corp. and then sold 150,000 of the 280,000 shares later in the month for a short-term loss of approximately $1.5 million.

75.     BLMIS also generated short-term fictitious losses for S&R Investment Co. Account 1SH079.  In the November 2003 statement for Account 1SH079, BLMIS reported that it had

purchased and then sold large blocks of shares of Apple Computers Inc., Delta Airlines, Inc., and Priceline.com Inc. for a collective short-term loss of approximately $2.5 million.

76.    However, the short-term losses generated from these purported trades pale in comparison to the short-term losses generated from the backdated and fictitious short sales of Sears Roebuck & Co. in Account 1SH079.  BLMIS did not report these short sales, which purportedly took place during March 2003 in a newly opened "-80" subaccount of 1SH079, to Stanley Shapiro until at least November 2003.  In fact, the schedule of unrealized gains and losses prepared by Stanley Shapiro's accountant for Account 1SH079 as of June 30, 2003, did not contain these short sales.  The schedule did not even reflect the existence of a "-80" subaccount.  BLMIS did not generate the statements relating to the subaccount, which reflected these March short sales, until in or around December 2003.  The nine or ten months' worth of statements that BLMIS eventually provided to Stanley Shapiro for Account 1SH079 reported that BLMIS sold short 325,000 shares of Sears Roebuck in March for approximately $6 million. Over the next eight months, the share price of Sears Roebuck stock increased significantly, and in the November 2003 statement of Account 1SH079, BLMIS reported that it covered the short position by acquiring 325,000 shares of the stock at a cost of approximately $18 million.  The fictitious short-term loss for S&R Investment Co. relating to the short sales of Sears Roebuck totaled nearly $12 million.  A reasonable investor, let alone an investor with Stanley Shapiro's experience, would have asked why he or she had not learned earlier about a transaction which, in less than nine months, caused a $12 million loss.

77.    The $12 million loss from the backdated and fictitious short sales of Sears Roebuck, however, substantially resolved the tax problem that Stanley and Renee Shapiro had faced earlier in the year as a result of the $27 million in fictitious gains reported in S&R Investment Co.'s

Account 1SH014.  The massive fictitious losses engineered by BLMIS through the Sears

Roebuck and other fictitious transactions effectively eliminated any tax liability Stanley and

Renee Shapiro faced for the 2003 tax year.  In the end, Stanley and Renee Shapiro only owed

$85 in federal taxes for the 2003 tax year.  After considering taxes withheld during the year,

Stanley and Renee Shapiro actually received a refund of $629 from the federal government.

78.    Based on the foregoing activity in their accounts, Stanley Shapiro and the other

Account Holders were placed on notice that the trading in their BLMIS accounts was highly

irregular and not legitimate, and therefore, they unquestionably were either aware of, or should

have been aware of, the fraudulent activity at BLMIS.

      F.     <u>DEFENDANT STANLEY SHAPIRO'S NOTICE OF FRAUDULENT
           ACTIVITY AT BLMIS MUST BE IMPUTED TO ALL THE ACCOUNT
           HOLDERS</u>.

79.    Under the circumstances set forth above, Stanley Shapiro was on notice of

fraudulent activity at BLMIS.  To the extent that any of the other Account Holders were not

similarly on notice of the fraudulent activity at BLMIS, Stanley Shapiro's notice and lack of

good faith should be imputed to all of the Account Holders.  At the very least, Stanley Shapiro

was the agent of the Account Holders with respect to the management and control of their

Accounts.  Stanley Shapiro also exercised domination and control over all of the Accounts.

80.    The Account Holders authorized Stanley Shapiro to act as their agent in managing

and controlling the Accounts.  All actions undertaken by Stanley Shapiro related to each Account

fell within the scope of his responsibilities, and the facts giving rise to Stanley Shapiro's notice

of the fraudulent activity at BLMIS and lack of good faith were acquired within the scope of his

agency relationship.  As the agent of the Account Holders, Stanley Shapiro communicated with,

and provided direction to, BLMIS regarding the Accounts.  He reviewed and notated the

Accounts' BLMIS customer statements and directed the purported purchase and sale of securities

in the Accounts.  Upon information and belief, Stanley Shapiro had unlimited access to and control of the funds in the Accounts.

81.    Stanley Shapiro also exercised domination and control over the Accounts.  He served as partner of S&R Investment Co. and trustee for the David Shapiro Trust and Leslie Shapiro Trust.  Stanley Shapiro personally established these entities for his and his family's benefit.  Every major decision regarding S&R Investment Co. and the trusts established for the benefit of his family was made by Stanley Shapiro, and Stanley Shapiro was the controlling decision maker for each of these entities.  As noted above, Stanley Shapiro communicated with, and provided direction to, BLMIS regarding the Accounts, he reviewed and notated the Accounts' BLMIS customer statements, and directed the purported purchase and sale of securities in the Accounts.  Upon information and belief, Stanley Shapiro had unlimited access to and control over the funds in these entities' BLMIS accounts.

## THE TRANSFERS

82.    According to BLMIS's records, the Account Holders maintained multiple accounts (Nos. 103012, 103029, 10303915, 1C1214, 1C1251, 1C1327, 1C1345, 1S0306, 1S0540, 1SH014, 1SH027, 1SH028, 1SH029, 1SH030, 1SH079, 1SH171, and 1SH172) with BLMIS, as set forth on Exhibit A (collectively, the "Accounts").  Upon information and belief, each of the Account Holders executed a Customer Agreement, an Option Agreement, and/or a Trading Authorization Limited to Purchases and Sales of Securities and Options, (the "Account Agreements") for accounts 1C1214, 1C1251, 1C1327, 1C1345, 1S0306, 1SH014, 1SH027, 1SH028, 1SH029, 1SH030, 1SH079, 1SH171, and 1SH172, and delivered such documents to BLMIS at its headquarters either at 110 Wall Street, New York, New York, or later at 885 Third Avenue, New York, New York.

83.     The Account Agreements were to be performed in New York, New York through securities trading activities that would take place in New York, New York.  The Accounts were held in New York, New York, and Defendants sent funds to BLMIS and/or to BLMIS's account at JPMorgan Chase & Co., Account #xxxxxxxxxxx703 (the "BLMIS Bank Account") in New York, New York for application to the Accounts and the purported conducting of trading activities.  Between the date the Accounts were opened and the Filing Date, Defendants made deposits to BLMIS through checks and/or wire transfers into bank accounts controlled by BLMIS, including the BLMIS Bank Account, and/or received inter-account transfers from other BLMIS accounts.

84.     Prior to the Filing Date, BLMIS made payments or other transfers (collectively, the "Transfers") directly or indirectly to Initial Transferee Defendants totaling $53,778,486, under circumstances which should have put them on notice that the Transfers were made for a fraudulent purpose.  Of this amount, $50,398,126 constituted non-existent profits supposedly earned in the Accounts, and $3,380,360 constituted the return of principal.  The Fictitious Profits received by Initial Transferee Defendants were other people's money.  The Transfers include, but are not limited to, the Transfers listed in Column 9 of the schedules attached at Exhibit B.

85.     The Transfers are avoidable and recoverable under sections 544, 548, 550(a), and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly 15 U.S.C. section 78fff-2(c)(3), and applicable provisions of N.Y. C.P.L.R. 203(g) and 213(8)(McKinney 2001), and DCL sections 273–279 (McKinney 2001).

86.     Of the Transfers, BLMIS made payments directly or indirectly to Initial Transferee Defendants of at least $41,066,486 during the six years prior to the Filing Date (the "Six Year Transfers"), which are avoidable and recoverable under sections 544, 550(a), and 551

of the Bankruptcy Code, applicable provisions of SIPA, particularly 15 U.S.C. section 78fff-2(c)(3), and applicable provisions of DCL sections 273–276.  Of the Six Year Transfers, $39,939,486 constituted Fictitious Profits from the Ponzi scheme.  The Fictitious Profits received by Initial Transferee Defendants were other people's money.  The remaining $1,127,000 constituted the return of principal.  The Six Year Transfers are listed in Column 10 of the schedules attached at Exhibit B.

87.     Of the Six Year Transfers, BLMIS made payments directly or indirectly to Initial Transferee Defendants of at least $9,482,424 during the two years prior to the Filing Date (the "Two Year Transfers"), which are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly 15 U.S.C. section 78fff-2(c)(3).  Of the Two Year Transfers, $9,475,424 constituted Fictitious Profits and $7,000 constituted the return of principal.  The Fictitious Profits received by Initial Transferee Defendants were other people's money.  The Two Year Transfers are listed in Column 11 of the schedules attached at Exhibit B.

88.     On information and belief, the Initial Transferee Defendants subsequently transferred some of the $53,778,486 of the Transfers (the "Subsequent Transfers") to Defendants Stanley Shapiro, Renee Shapiro, LAD Trust, David Shapiro, David Shapiro Trust, Rachel Shapiro, Trust f/b/o David Shapiro's Children, Leslie Shapiro Citron, Leslie Shapiro Trust, Trust f/b/o Leslie Shapiro Citron's Children, and Kenneth Citron (again, collectively, the "Subsequent Transferee Defendants").

89.     The Subsequent Transfers, or the value thereof, are recoverable from Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

90.     To the extent that any of the recovery counts may be inconsistent with each other, they are to be treated as being pled in the alternative.

91.     The Trustee's investigation is ongoing and the Trustee reserves the right to (i) supplement the information regarding the Transfers, the Subsequent Transfers and any additional transfers, and (ii) seek recovery of such additional transfers.

## CUSTOMER CLAIMS

92.     On or about June 29, 2009, certain Account Holders filed customer claims relating to certain of their Accounts ("Customer Claims"), which the Trustee designated as Claims # 012227, # 012228, # 012386, # 012387, and # 013658.  These Customer Claims referenced Accounts 1SH172, 1SH014, 1S0306, 1SH028, and 1C1251, respectively.  On or about June 30, 2009, certain Account Holders filed two additional Customer Claims, which the Trustee designated as Claims # 015644 and # 015645, and which referenced Accounts 1SH171 and 1SH030, respectively.  (# 012227, # 012228, # 012386, # 012387, # 013658, # 015644, and # 015645, collectively, the "Customer Claims").  *See* Exhibit A.

93.     On May 25, 2010, the Trustee issued a Notice of Trustee's Determination of Claim (a "Determination") with respect to Customer Claim # 013658, and on or about June 16, 2010, the Trustee issued a Determination with respect to Customer Claims # 012227, # 012386, # 012387, # 015644, and # 015645.  On October 7, 2010, the Trustee issued a Determination with respect to Customer Claim # 012228, and on November 10, 2010, the Trustee issued a revised Determination with respect to Customer Claim # 012228.  The Determinations are attached hereto at Exhibit C.

94.     On or about June 23, 2010, Kenneth Citron filed with the Court an objection to the Determination for Customer Claim # 013658.  On or about July 1, 2010, Kenneth Citron

withdrew this objection and filed an amended objection to the Determination for Customer
Claim # 013658.

95.     Defendants filed no objections relating to the Determinations for Customer
Claims # 012227, # 012228, # 012386, # 012387, # 015644, and # 015645.  Having failed to file
an objection to the Trustee's Determinations for Customer Claims # 012227, # 012228,
# 012386, # 012387, # 015644, and # 015645, the Trustee's Determinations of such Claims are
final, and the Claims are disallowed for all purposes under the Claims Procedure Order (as
defined below).

96.     Defendants Trust f/b/o David Shapiro's Children and Trust f/b/o Leslie Shapiro
Citron's Children held Accounts 1S0540 and 1C1345 at BLMIS (collectively, the "Related
Accounts").  Upon information and belief, the Related Accounts were funded with subsequent
transfers from Defendants.  Customer claims relating to the Related Accounts were filed on
March 3 and 4, 2009, which the Trustee designated as Claims # 005116 and # 005656,
respectively.  Because of a typographical error in Claim # 005116, certain Account Holders filed
three additional customer claims related to Account 1C1345, which the Trustee designated as
Claims # 012211, # 012212, and # 012213 (together, with Claims # 005116 and # 005656, the
"Related Account Customer Claims").

97.     On December 17, 2010, the Trustee issued a Determination with respect to
Related Account Customer Claims # 012211, # 012212, and # 012213.  Defendants filed no
objections relating to these Determinations, and under the Claims Procedures Order, the
Trustee's Determinations are final and are disallowed for all purposes.  The Trustee has yet to
issue a determination or make distributions with respect to the other Related Account Customer
Claims (specifically, Claims # 005116 and # 005656).

98.     On December 23, 2008, this Court entered an Order on Application for Entry of an Order Approving Form and Manner of Publication and Mailing of Notices, Specifying Procedures for Filing, Determination and Adjudication of Claims, and Providing Other Relief ("Claims Procedures Order" (Docket No. 12)).  The Claims Procedures Order includes a process, under which the Trustee has been operating, for the determination and allowance of claims.

99.     The Trustee intends to resolve Customer Claim # 013658 and the Related Account Customer Claims pursuant to the Claims Procedures Order.

### COUNT ONE
### FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(A), 550 AND 551
### INITIAL TRANSFEREE DEFENDANTS

100.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this First Amended Complaint as if fully rewritten herein.

101.    Each of the Two Year Transfers was made on or within two years before the filing date of BLMIS's case.

102.    Each of the Two Year Transfers constituted a transfer of an interest of BLMIS in property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code and pursuant to 15 U.S.C. section 78fff-2(c)(3).

103.    Each of the Two Year Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud some or all of BLMIS's then existing or future creditors.  BLMIS made the Two Year Transfers to or for the benefit of Initial Transferee Defendants in furtherance of a fraudulent investment scheme.

104.    Each of the Two Year Transfers constitute a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from Initial Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code and 15 U.S.C. section 78fff-(2)(c)(3).

105.    As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against Initial Transferee Defendants: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from the Initial Transferee Defendants for the benefit of the estate of BLMIS.

**COUNT TWO**
**FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(B), 550 AND 551**
**INITIAL TRANSFEREE DEFENDANTS**

106.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this First Amended Complaint as if fully rewritten herein.

107.    Each of the Two Year Transfers was made on or within two years before the Filing Date.

108.    Each of the Two Year Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code and pursuant to 15 U.S.C. section 78fff-2(c)(3).

109.    BLMIS received less than a reasonably equivalent value in exchange for each of the Two Year Transfers.

110.    At the time of each of the Two Year Transfers, BLMIS was insolvent, or became insolvent as a result of the Two Year Transfer in question.

111.    At the time of each of the Two Year Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

112.    At the time of each of the Two Year Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

113.     Each of the Two Year Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code, which is recoverable from Initial Transferee Defendants pursuant to section 550(a) and 15 U.S.C. section 78fff-(2)(c)(3).

114.     As a result of the foregoing, pursuant to sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against Initial Transferee Defendants: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from Initial Transferee Defendants for the benefit of the estate of BLMIS.

### COUNT THREE
### FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a) AND 551 INITIAL TRANSFEREE DEFENDANTS

115.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this First Amended Complaint as if fully rewritten herein.

116.     At all times relevant to the Six Year Transfers, there has been one or more creditors who has held and still holds matured or unmatured unsecured claims against BLMIS that are allowable under section 502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the Bankruptcy Code.

117.     Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

118.     Each of the Six Year Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Six Year Transfers to or for the benefit of the Initial Transferee Defendants in furtherance of a fraudulent investment scheme.

119.     Each of the Six Year Transfers was received by the Initial Transferee Defendants

with actual intent to hinder, delay or defraud creditors of BLMIS at the time of each of the Six

Year Transfers, and/or future creditors of BLMIS.

120.     As a result of the foregoing, pursuant to DCL sections 276, 276-a, 278, and/or

279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. section 78fff-

2(c)(3), the Trustee is entitled to a judgment against Initial Transferee Defendants:  (a) avoiding

and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside,

(c) recovering the Six Year Transfers, or the value thereof, from Initial Transferee Defendants

for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from Initial Transferee

Defendants.

### COUNT FOUR
### FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW
### §§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a) AND 551
### INITIAL TRANSFEREE DEFENDANTS

121.     The Trustee incorporates by reference the allegations contained in the previous

paragraphs of the First Amended Complaint as if fully rewritten herein.

122.     At all times relevant to the Six Year Transfers, there has been one or more

creditors who has held and still holds matured or unmatured unsecured claims against BLMIS

that are allowable under section 502 of the Bankruptcy Code or that are not allowable only under

section 502(e) of the Bankruptcy Code.

123.     Each of the Six Year Transfers constituted a conveyance by BLMIS as defined

under DCL section 270.

124.     BLMIS did not receive fair consideration for the Six Year Transfers.

125.     BLMIS was insolvent at the time it made each of the Six Year Transfers or, in the

alternative, BLMIS became insolvent as a result of each of the Six Year Transfers.

126.    As a result of the foregoing, pursuant to DCL sections 273, 278, and/or 279,
sections 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. section 78fff-2(c)(3),
the Trustee is entitled to a judgment against Initial Transferee Defendants:  (a) avoiding and
preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and
(c) recovering the Six Year Transfers, or the value thereof, from Initial Transferee Defendants
for the benefit of the estate of BLMIS.

### COUNT FIVE
### FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW §§274, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a) AND 551 INITIAL TRANSFEREE DEFENDANTS

127.    The Trustee incorporates by reference the allegations contained in the previous
paragraphs of the First Amended Complaint as if fully rewritten herein.

128.    At all times relevant to the Six Year Transfers, there has been one or more
creditors who has held and still holds matured or unmatured unsecured claims against BLMIS
that are allowable under section 502 of the Bankruptcy Code or that are not allowable only under
section 502(e) of the Bankruptcy Code.

129.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined
under DCL section 270.

130.    BLMIS did not receive fair consideration for the Six Year Transfers.

131.    At the time BLMIS made each of the Six Year Transfers, BLMIS was engaged or
was about to engage in a business or transaction for which the property remaining in its hands
after each of the Six Year Transfers was an unreasonably small capital.

132.    As a result of the foregoing, pursuant to DCL sections 274, 278, and/or 279,
sections 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. section 78fff-2(c)(3),
the Trustee is entitled to a judgment against Initial Transferee Defendants:  (a) avoiding and

preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and

(c) recovering the Six Year Transfers, or the value thereof, from Initial Transferee Defendants

for the benefit of the estate of BLMIS.

## COUNT SIX
### FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a) AND 551 INITIAL TRANSFEREE DEFENDANTS

133.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of the First Amended Complaint as if fully rewritten herein.

134.    At all times relevant to the Six Year Transfers, there has been one or more

creditors who has held and still holds matured or unmatured unsecured claims against BLMIS

that are allowable under section 502 of the Bankruptcy Code or that are not allowable only under

section 502(e) of the Bankruptcy Code.

135.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined

under DCL section 270.

136.    BLMIS did not receive fair consideration for the Six Year Transfers.

137.    At the time BLMIS made each of the Six Year Transfers, BLMIS had incurred,

was intending to incur, or believed that it would incur debts beyond its ability to pay them as the

debts matured.

138.    As a result of the foregoing, pursuant to DCL sections 275, 278, and/or 279,

sections 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. section 78fff-2(c)(3),

the Trustee is entitled to a judgment against Initial Transferee Defendants:  (a) avoiding and

preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and

(c) recovering the Six Year Transfers, or the value thereof, from Initial Transferee Defendants

for the benefit of the estate of BLMIS.

**COUNT SEVEN**
**RECOVERY OF ALL FRAUDULENT TRANSFERS – NEW YORK CIVIL**
**PROCEDURE LAW AND RULES 203(g), 213(8) AND NEW YORK DEBTOR AND**
**CREDITOR LAW §§ 276, 276-a, 278 AND/OR 279, 11 U.S.C. §§ 544, 550(a) AND 551**
**INITIAL TRANSFEREE DEFENDANTS**

139.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this First Amended Complaint as if fully rewritten herein.

140.    At all times relevant to the Transfers, the fraudulent scheme perpetrated by

BLMIS was not reasonably discoverable by at least one unsecured creditor of BLMIS.

141.    At all times relevant to the Transfers, there have been one or more creditors who

have held and still hold matured or unmatured unsecured claims against BLMIS that are

allowable under section 502 of the Bankruptcy Code or that are not allowable only under section

502(e) of the Bankruptcy Code.

142.    Each of the Transfers prior to the six years before the Filing Date constituted a

conveyance by BLMIS as defined under DCL section 270.

143.    Each of the Transfers was made by BLMIS with the actual intent to hinder, delay,

or defraud the creditors of BLMIS.  BLMIS made the Transfers to or for the benefit of Initial

Transferee Defendants in furtherance of a fraudulent investment scheme.

144.    Each of the Transfers was received by the Initial Transferee Defendants with

actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the Transfers,

and/or future creditors of BLMIS.

145.    As a result of the foregoing, pursuant to N.Y. C.P.L.R. 203(g), 213(8), DCL

sections 276, 276-a, 278 and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code,

and 15 U.S.C. section 78fff-2(c)(3), the Trustee is entitled to a judgment against Initial

Transferee Defendants:  (a) avoiding and preserving the Transfers, (b) directing that the

Transfers be set aside, (c) recovering the Transfers, or the value thereof, from the above Initial

Transferee Defendants for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees.

## COUNT EIGHT
## RECOVERY OF SUBSEQUENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW §§ 273-279 AND 11 U.S.C. §§ 544, 548, 550(a) AND 551 SUBSEQUENT TRANSFEREE DEFENDANTS

146.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this First Amended Complaint as if fully rewritten herein.

147.    Each of the Transfers is avoidable under sections 544 and 548 of the Bankruptcy

Code, DCL sections 273-276, and 15 U.S.C. section 78fff-2(c)(3).

148.    On information and belief, the Subsequent Transfers were transferred by Initial

Transferee Defendants to Subsequent Transferee Defendants.

149.    Each of the Subsequent Transfers was made directly or indirectly to, or for the

benefit of, one or more of the Subsequent Transferee Defendants.

150.    Subsequent Transferee Defendants are immediate or mediate transferees of the

Subsequent Transfers from Initial Transferee Defendants.

151.    Each of the Subsequent Transfers received by Subsequent Transferee Defendants

Stanley Shapiro, Renee Shapiro, S&R Investment Co., LAD Trust, David Shapiro, David

Shapiro Trust, Leslie Shapiro Citron, Leslie Shapiro Trust, and Kenneth Citron was received

with actual intent to hinder, delay or defraud creditors of BLMIS at the time of each of the

Subsequent Transfers, and/or future creditors of BLMIS.

152.    As a result of the foregoing and the avoidance of the within Transfers, pursuant to

DCL sections 278 and/or 279, section 550(a) of the Bankruptcy Code, and 15 U.S.C. section

78fff-2(c)(3), the Trustee is entitled to a judgment against Subsequent Transferee Defendants:

(a) recovering the Subsequent Transfers, or the value thereof, from the Subsequent Transferee

Defendants for the benefit of the estate of BLMIS, and (b) recovering attorneys' fees from

Stanley Shapiro, Renee Shapiro, S&R Investment Co., LAD Trust, David Shapiro, David

Shapiro Trust, Leslie Shapiro Citron, Leslie Shapiro Trust, and Kenneth Citron.

**COUNT NINE**
**DISALLOWANCE OF CERTAIN CUSTOMER CLAIMS**

153.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this First Amended Complaint as if fully rewritten herein.

154.    Account Holders are grantors, trustees, and subsequent transferors of the Related

Accounts.  Upon information and belief, the Related Accounts were funded with fictitious profits

and are conduits for the Account Holders.

155.    The Related Account Customer Claims (Nos. # 005116, # 005656, # 012211,

# 12212, and # 122136) should not be allowed pursuant to section 502(d) of the Bankruptcy

Code.  Account Holders are the recipients of Transfers of BLMIS's property which are avoidable

and recoverable under 15 U.S.C. section 78fff-2 (c) (3) and sections 544, 548 and/or 550 of the

Bankruptcy Code, DCL sections 273-279, and 15 U.S.C. section 78fff-2(c)(3), and Account

Holders have not returned the Transfers to the Trustee.

156.    Account Holders have also filed Customer Claims in the SIPA proceeding.  The

Trustee has issued Determinations with respect to the Customer Claims; however, Defendant

Kenneth Citron has filed an objection regarding Customer Claim # 13658.

157.    Customer Claim # 13658 should not be allowed pursuant to section 502(d) of the

Bankruptcy Code.  Defendant Kenneth Citron is a recipient of Transfers of BLMIS's property

which are avoidable and recoverable under sections 547 and 550 of the Bankruptcy Code, and

Defendant has not returned the Transfers to the Trustee.

158.     The Claims Procedures Order includes a process for determination and allowance

of claims under which the Trustee has been operating.  As a result of the foregoing, the Trustee

intends to resolve the Related Account Customer Claims and Customer Claim # 13658 as

contemplated by the Claims Procedures Order.

<u>COUNT TEN</u>
<u>EQUITABLE SUBORDINATION OF DEFENDANTS' CUSTOMER CLAIMS</u>

159.     The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this First Amended Complaint as if fully rewritten herein.

160.     Account Holders engaged in inequitable conduct, including behavior described in

this First Amended Complaint, that has resulted in injury to creditors and investors and has

conferred an unfair advantage on Account Holders.

161.     Based on the Account Holders inequitable conduct as described above, the

customers of BLMIS have been misled as to the true financial condition of BLMIS, customers

have been induced to invest without knowledge of the actual facts regarding BLMIS's financial

condition, and/or customers and creditors are less likely to recover the full amounts due to them

because of the conduct of the Account Holders.

162.     The Court should exercise the full extent of its equitable powers to ensure that

claims, payments, or benefits, of whatever kind or nature, which are asserted or sought by the

Account Holders directly or indirectly against the estate—specifically the Related Account

Customer Claims and Customer Claim # 13658 and only to the extent such claims are allowed—

are subordinated for distribution purposes pursuant to sections 510(c)(1) and 105(c) of the

Bankruptcy Code.

163.     Equitable subordination as requested herein is consistent with the provisions and

purposes of the Bankruptcy Code.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the Defendants as follows:

*i.*        On the First Claim for Relief, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code and 15 U.S.C. section 78fff-2(c)(3): (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from Initial Transferee Defendants for the benefit of the estate of BLMIS;

*ii.*        On the Second Claim for Relief, pursuant to sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code and 15 U.S.C. section 78fff-2(c)(3): (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from Initial Transferee Defendants for the benefit of the estate of BLMIS;

*iii.*        On the Third Claim for Relief, pursuant to DCL sections 276, 276-a, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code and 15 U.S.C. section 78fff-2(c)(3): (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, (c) recovering the Six Year Transfers, or the value thereof, from Initial Transferee Defendants for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from Initial Transferee Defendants;

*iv.*        On the Fourth Claim for Relief, pursuant to DCL sections 273, 278, and/or 279, sections 544(b), 550, and 551 of the Bankruptcy Code and 15 U.S.C. section 78fff-2(c)(3): (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from Initial Transferee Defendants for the benefit of the estate of BLMIS;

*v.*        On the Fifth Claim for Relief, pursuant to DCL sections 274, 278, and/or 279,

sections 544(b), 550, 551 of the Bankruptcy Code and 15 U.S.C. section 78fff-2(c)(3):

(a) avoiding and preserving the Six Year Fraudulent Transfers, (b) directing the Six Year

Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from

Initial Transferee Defendants for the benefit of the state of BLMIS;

*vi.*       On the Sixth Claim for Relief, pursuant to DCL sections 275, 278, and/or 279,

sections 544(b), 550, 551 of the Bankruptcy Code and 15 U.S.C. section 78fff-2(c)(3):

(a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be

set aside, and (c) recovering the Six Year Transfers, or the value thereof, from Initial Transferee

Defendants for the benefit of the estate of BLMIS;

*vii.*      On the Seventh Claim for Relief, pursuant to N.Y. C.P.L.R. 203(g) and 213(8),

DCL sections 276, 276-a, 278 and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy

Code and 15 U.S.C. section 78fff-2(c)(3):  (a) avoiding and preserving the Transfers, (b)

directing that the Transfers be set aside, and (c) recovering the Transfers, or the value thereof,

from Initial Transferee Defendants, and (d) recovering attorneys' fees;

*viii.*     On the Eighth Claim for Relief as a result of the avoidance of the within

Transfers, pursuant to DCL sections 273-279, sections 544 and 548 of the Bankruptcy Code, and

15 U.S.C. section 78fff-2(c)(3):  (a) recovering the Subsequent Transfers, or the value thereof,

from Subsequent Transferee Defendants for the benefit of the estate of BLMIS, and

(b) recovering attorneys' fees from Stanley Shapiro, Renee Shapiro, S&R Investment Co., David

Shapiro, David Shapiro Trust, Leslie Shapiro Citron, Leslie Shapiro Trust, and Kenneth Citron;

*ix.*   On the Ninth Claim for Relief, the Related Account Customer Claims and Customer Claim # 13658 should be disallowed pursuant to section 502(d) of the Bankruptcy Code unless and until the avoidable Transfers are paid to the Trustee;

*x.*   On the Tenth Claim for Relief, for equitable subordination of the Related Account Customer Claims and Customer Claim # 13658;

*xi.*   On all Claims for Relief, pursuant to federal common law and N.Y. C.P.L.R. 5001 and 5004, awarding the Trustee prejudgment interest from the date on which the Transfers were received;

*xii.*   On all Claims for Relief, establishment of a constructive trust over the proceeds of the transfers in favor of the Trustee for the benefit of the estate of BLMIS;

*xiii.*   On all Claims for Relief, assignment of the Defendants' income tax refunds from the United States, state and local governments paid on fictitious profits during the course of the scheme;

*xiv.*   Awarding the Trustee all applicable interest, costs, and disbursements of this action; and

**[*Remainder of page intentionally left blank.*]**

     *xv.*     Granting the Trustee such other, further, and different relief as the Court deems

just, proper, and equitable.


Date:  April 26, 2011
     New York, New York

Of Counsel:

**BAKER & HOSTETLER LLP**
PNC Center
1900 E. 9th Street, Suite 3200
Cleveland, Ohio 44114
Telephone:  (216) 621-0200
Facsimile:  (216) 696-0740
James H. Rollinson
Email:  jrollinson@bakerlaw.com

By:  /s/ Ona T. Wang
**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201
David J. Sheehan
Email:  dsheehan@bakerlaw.com
Keith R. Murphy
Email:  kmurphy@bakerlaw.com
Geraldine E. Ponto
Email:  gponto@bakerlaw.com
Ona T. Wang
Email:  owang@bakerlaw.com
Naima J. Garvin
Email:  ngarvin@bakerlaw.com
Torello H. Calvani
Email:  tcalvani@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities*
*LLC and Bernard L. Madoff*